## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**DAYMON BELL,**

      **Plaintiff,**

**v.**                                                    **Case: 8:22-cv-01054-KKM-TGW**

**PROGRESSIVE SELECT**
**INSURANCE COMPANY,**

      **Defendant.**

_____/

## PLAINTIFF, DAYMON BELL'S RESPONSE IN OPPOSITION TO DEFENDANT PROGRESSIVE SELECT INSURANCE COMPANY'S MOTION FOR FINAL SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 3.01, Plaintiff Daymon Bell ("Bell"), hereby responds in opposition to the *Motion for Final Summary Judgment* ("Motion") filed by Defendant, Progressive Select Insurance Company, ("Progressive"), and states:

Controlling Florida law is unequivocal that the question of whether an insurer has failed "to act in good faith with due regard for the interests of [its] insured *is for the jury*," and it is a *rare* case when a court should resolve such a question prior to trial.[1] This is not a rare case. Rather, it is a sadly familiar case where the totality of the

---

[1] *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 672 (Fla. 2004); *e.g.*, *Harvey v. Geico Gen. Ins. Co.*, 259 So. 3d 1, 7 (Fla. 2018).

circumstances—when viewed in the light most favorable to the non-movant and with every inference drawn in his favor—will easily allow reasonable jurors to conclude that a Florida insured (Bell) faces a substantial excess judgment because his insurer (Progressive) did not act in good faith or with due regard for him when the insurer failed to settle bodily injury claims for the reasonable sum of the insurance policy limits.

With a myopic perspective, improper inferences drawn in Progressive's favor, and reliance on plainly distinguishable and unpersuasive case law, the Motion argues that Progressive simply had an innocent disagreement with lawyers for Howard Mathews ("Mathews") concerning the value of Mathews' bodily injury claims ("BI Claims"). Although unlikely, some jurors might view the evidence in that light. However, as explained in more detail below, the record in this action includes more than sufficient evidence from which most reasonable jurors should conclude that Progressive's inexplicably low valuation, absurd adherence thereto, and lengthy inaction during the claims review process resulted from Progressive's unlawful focus on its own financial interests and blindness to the risks faced by Bell. Accordingly, this Court should deny the flawed Motion and allow a jury to resolve the parties' disputes.

### SUMMARY OF THE RECORD FACTS
### VIEWED IN THE LIGHT MOST FAVORABLE TO BELL

An outline of certain undisputed facts is available to the Court in the parties' Joint Statement of Undisputed Facts (*see* Doc. 34), and a skewed version of the facts

is set forth in the Motion (*see* Doc. 33). Nonetheless, in resolving the Motion, the Court should primarily rely on the facts set forth by Bell below because, at the summary judgment stage, the Court: (1) must review the facts "in the light most favorable to the non-moving party" (*e.g.*, *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001)); and (2) must not "weigh conflicting evidence or [] make credibility determinations" (*e.g.*, *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)). In short, in resolving the Motion, Bell's "evidence is to be believed, and all justifiable inferences are to be drawn in his favor." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

On July 16, 2015, Bell caused a "moderate" two-vehicle accident ("MVA") in Manatee County, Florida—between himself in a 2006 Dodge Ram ("Ram") and Mathews in a 2001 Oldsmobile Aurora ("Aurora"). (*See* Doc. 34, par. 1; Doc. 34-1; *see also* Doc. 34-4, pp. 23:13-16; 26:16-27:6.) The responding law enforcement officer ("Officer") issued citations to Bell for running a stop sign and unknowingly operating the Ram with a suspended driver's license. (*See* Doc. 34, par. 1.) The Officer further reported that Mathews' actions did not contribute to the MVA, and the Aurora was towed from the MVA scene. (*See* Doc. 34, par. 1; Doc. 34-1, p. 3.)

Experiencing pain in his back, neck, and radiating into his right shoulder, Mathews was transported from the MVA scene to Lakewood Ranch Medical Center ("LRMC") by EMS. (*See* Doc. 34, par. 1; *see also* Doc. 34-14, p. 12 (PRG 04697).) At

67 years of age, Mathews' age was a risk factor. (*See* Doc. 34, par. 16.a.; *see also* Doc. 34-14, p. 12 (PRG 04697).) After a CT scan, which revealed some degenerative changes, Mathews was diagnosed with a "cervical sprain." (*See* Doc. 34, par. 16.a.) He was prescribed muscle relaxants, an anti-inflammatory, and was directed to minimize activity and treat with ice at home. (*See* Doc. 34-14, pp. 19-20 (PRG 04704–04705).) Advised that physical therapy may be needed, Mathews was instructed to seek follow up care in one week if he did not see improvement. (*See id*.) Mathews did not see improvement; he worsened, and he sought follow-up care. (*See* Doc. 34, par. 16.b.)

On July 17, 2015, Mathews' insurer—claims examiner Shana Boyle ("Boyle") for Hartford Insurance Company of the Midwest ("Hartford")—provided Progressive with notice of the MVA—including that Mathews had been transported to the LRMC emergency room with neck and back injuries. (*See* Doc. 34, par. 3.) Initially, Progressive assigned Miguel Sandoval to investigate the BI Claim. (*See* Doc. 34, par. 4.) One week later, Progressive documented its decision that the insurance policy purchased by Bell provided coverage for the BI Claim. (*See* Doc. 34, par. 5.)

On July 24, 2015, Progressive assigned the BI Claim to Beverly Venable ("Venable"). (*See* Doc. 34, par. 6.) Six days later, Venable received a letter of representation for Mathews from Marc Yonker, Esq. ("Yonker") of Winters & Yonker ("W&Y"). (*See* Doc. 34, par. 9; Doc. 34-7.) That same day, Venable determined that

Bell was fully liable for the MVA. (*See* Doc. 34, par. 8; see also Doc. 34-5, p. 20:10-12.) Venable also reviewed an ISO report, which notably showed no prior accidents or injury hits for Mathews. (*See id*.; Doc. 34-4, pp. 26:16–27:6.)

In correspondence directed to Venable at Progressive, dated January 8, 2016, W&Y detailed the medical issues suffered by Mathews because of the MVA ("Demand Letter"). (*See* Doc. 34-13; see also Doc. 34-5, p. 30-21.) Providing copies of all available medical documentation, the Demand Letter emphasized several points:

(a)      since the MVA, Mathews immediately and consistently sought medical care for painful, permanent injuries to three different areas of his body—his neck (cervical region), back (lumbar region), and right shoulder;

(b)      in August 2015, MRI testing revealed "glenoid labral irregularities with anterior labral tearing and inflammatory signal with marginal irregularity at the acromioclavicular joint" in Mathews' right shoulder ("Shoulder Injury"), herniated and bulging discs in his cervical spine ("Neck Injury"), and bulging disc in his lumbar spine ("Back Injury");

(c)      multiple surgeons had recommended that Mathews required surgical interventions to address the Shoulder and Neck Injuries, which were caused in the MVA;

(d)      in addition to, or in lieu of shoulder surgery, shoulder injections were recommended to Mathews for pain management purposes;

(e)      injections also were recommended for the aggravation of preexisting lumbar injury—Back Injury—with surgery potentially recommended if Mathews' Back Injury worsened;

(f)      in December 2015, Mathews was adjudged to have suffered an 8% whole person permanent impairment directly related to the MVA;

(g)     in the five months since the MVA, Mathews had incurred medical expenses of $21,942.94; and

(h)     just one of the surgical interventions—the shoulder surgery—was estimated to cost $30,000.00 to $35,000.00.

(*See* Doc. 34-13; *see also* Doc. 34-6, p. 35:11-12.) In conclusion, the Demand Letter observed that Progressive's review of the enclosed documentation would confirm that the "matter has a settlement value that clearly exceeds the minimal amount of your policies liability limits"—$100,000.00.   (*See id.*; *see also* Doc. 34-6, pp. 57:20– 58:3.)

After reviewing the Demand Letter, Venable's supervisor Robert Moore ("Moore"), hand-delivered it to Venable on January 12, 2016. (*See* Doc. 34. par. 17.) A week after sending Mathews' medical bills to be processed by specialized software,[2] on January 27, 2016, Venable documented her evaluation of the BI Claim in the claim notes. (*See* Doc. 34-2, p. 13.) Specifically, Venable adopted the monetary range inexplicably produced by another software program available to Progressive bodily injury claims adjusters called Liability Navigator ("LNAV"). (*See* Doc. 34-4, pp. 67:5-12, 16-21, 68:23–69:1, 69:6-11, 71:21-25, 107:16–108:6 (attempting to explain LNAV

---

[2] Although ignorant of how it functions, Progressive claim adjusters—including Venable—utilized software programs ("MDP" and "LNAV") that operated to reduce medical bills submitted by claimants.  (*See* Doc. 34-4, pp. 63:23–64:24; Doc. 34-30, pp. 38:5, 41:1-6 (explaining that MDP did not account for future medical expenses and was not used in Progressives' Large Loss Unit.)

software); *see also* Doc. 34-30, p. 42:15-16 (denying use of LNAV software in Large Loss Unit).) The range was $13,026.00 to $19,004.00. (*See* Doc. 34-2, p. 13.)

Moore reviewed Venable's analysis and approved her authority up to $19,004.00. Nonetheless, Venable chose to *round down* to $13,000.00 as her valuation of the BI Claim and as her initial settlement offer. For negotiation strategy, Venable wrote:

> This is a 67 year old male, Manatee venue, moderate [damage] to both [insured's vehicle] and [claimant's vehicle], although no prior injury hits, CLMT does have degenerative findings in cerv and lumbar. Self to ER, then followed up with Physician's Group, and Neuro, [treatment] included 2 injections to right shoulder. PIP exhausted. Considered [out of pocket ("OOP")] of 4K this included MDP [software], however, after PIP exhausted the OOP are 7,700. Soft surgical recommendation, overall good recovery.

(*See* Doc. 34-2, p. 13.) Reserves were adjusted to $20,000.00. (*See id.*) Notably, Venable was simply wrong in stating that Mathews took himself to the ER—he was taken by EMS on a backboard. (*See* Doc. 34-14, p. 15.) Further, Venable's assertion that Mathews had an "overall good recovery" is ludicrous. The medical documentation is unequivocal that Mathews was permanently injured, remained in terrible pain, and was continuing to undergo treatment—including plans to undergo recommended surgery. (*See* Doc. 34-14, generally).

Unsurprisingly, when Venable conveyed Progressive's $13,000.00 settlement offer over the phone to case manager Philip Oles at W&Y, it was not received well. (Doc. 34-6, p. 47:11-14 (describing it as "ridiculously low"); *see id.* at 41:17–48:10.)

7

During that call, Oles attempted to correct Venable's OOP calculations (from $7,000 to $10,176.19), but Venable would not concede that the $3,000.00 difference in their respective numbers would have any impact on Venable's offer. (*See* Doc. 34-6, p. 56:3-7.) Yet, it did make a difference to the reserve—justifying an increase to $25,000.00 according to Moore. (*See* Doc. 34-4, pp. 49:1-10, 88:6-9.)

During Venable's call with Oles, she was dismissive and obtuse. "All findings are degenerative" Veneble told Oles.  (Doc. 34-12, pp. 34:21–35:1.) Venable wrote in the claim notes that "Philip [Oles] said I am not understanding what he is telling me. *That surgery is necessary*." (*See* Doc. 34-4, p. 42:16-22.) Nonetheless, in subsequent correspondence, Venable confirmed in writing that Oles represented that Mathews *will* have an anterior cervical discectomy and fusion (ACDF) and shoulder surgery. (*See* Doc. 34-4, pp. 46:12-25, 47:21-24, 82:4-8.) From April of 2016 to November of 2016, Venable and Progressive simply ignored the BI Claims against Bell. (*See* Doc. 34-4, pp. 60:6-25, 81:9-12 (noting no effort made to interview Mathews); Doc. 34-6, pp. 65:1-7, 67:16-25.)

On August 16, 2016, Mathews underwent the recommended ACDF procedure at his C3-C4 level. (*See* Doc. 34, par. 31).

On November 8, 2016, W&Y sent Venable and Progressive an excess demand for $150,000.00 which outlined Mathews' recent treatment including his recently completed, recommended neck surgery at the C3-C4 level. (*See* Doc. 34-27, p. 1-5,

PRG 010205). The ACDF procedure completed at the C3-C4 level is the same surgery discussed and recommended by the previous surgeons Mr. Mathews' had seen following the crash. (*See* Doc. 34-14, p. 122, PRG 04807, see also p. 228, PRG 04913). The letter itemized Mathews' medical bills to date which totaled $149,631.24 following the ACDF. (*See id.*)

On December 1, 2016, a different Progressive adjuster, Kris Mancini, responded to the November 8 demand by offering to tender Progressive's $100,000 bodily injury policy limits for the first time and included an affidavit from Bell showing that he was not able to financially contribute to any settlement. (*See* Doc. 34-31, p. 1, PRG 010195).

On December 29, 2016, W&Y filed suit on behalf of Mathews against Bell. (*See* Doc. 34, par. 40).

## MEMORANDUM OF LAW

### I.   Summary Judgment Standard

Entry of summary judgment against a civil party is permissible only when the movant has shown that there is no genuine dispute as to any material fact and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008) (noting that the moving party shoulders the burden of showing the absence of a genuine issue of material fact). An issue is "genuine" if "a reasonable trier of fact could return judgment for the non-moving

party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). A fact is "material" if it might affect the outcome of the suit under the governing law." *See id.* (quoting *Anderson*, 477 U.S. at 247-48).

## II.   A reasonable jury should find that Progressive breached its duty of good faith when handling Mathews' BI Claim against Bell

### A.   Florida Insurance Bad Faith Law

It is undisputed that Florida law governs this action. "In diversity cases arising under Florida law, a federal court is bound by the law articulated by the Florida Supreme Court." *Steffen v. Gray, Harris & Robinson, P.A.*, 283 F. Supp. 2d 1272, 1281, n. 22 (M.D. Fla. 2003), *aff'd sub nom.*, 138 Fed. App'x 297 (11th Cir. 2005). Absent controlling Florida Supreme Court case law, "Florida District Court of Appeals decisions control." *See id.* (citing *Shapiro v. Associated Int'l Ins. Co.*, 899 F2d 1116, 1116 (11th Cir. 1990). Ultimately, federal courts applying Florida law must "make an 'educated guess' as to how a Florida court would rule." *See id.*

Under Florida law, "an insurer owes a duty of good faith to its insured." *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 672 (Fla. 2004). This duty arises because the liability insurance contract requires "the insured surrender to the insurance company control over whether the claim is settled." *Id.* at 682. In turn, the duty of good faith "imposes a fiduciary obligation on an insurer to protect its insured from a judgment that exceeds

the limits of the insured's policy." *Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 3 (Fla. 2018). This fiduciary duty of good faith:

> obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same. The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and *settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery would do so.* Because the duty of good faith involves diligence and care in the investigation and evaluation of the claim against the insured, negligence is relevant to the question of good faith.

*Id*. at 6–7 (quoting *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980) (emphasis added)). Importantly, these obligations "are not a mere checklist." *See id*. Rather,

> [a]n insurer is not absolved of liability simply because it advises its insured of settlement opportunities, the probable outcome of the litigation, and the possibility of an excess judgment. *Rather, the critical inquiry in a bad faith case is whether the insurer diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment.*

*Harvey*, 259 So. 3d at 7 (emphasis added). The insurer's ultimate tender of policy limits does not automatically insulate an insurer from liability for bad faith." *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 15 (Fla. 3d DCA 1991). Ultimately, "it is for the jury to decide whether the insurer failed to 'act in good faith with due regard for the interests of the insured.'" *Harvey*, 259 So. 3d at 7 (quoting *Boston Old Colony*, 386 So. 2d at 785). It is difficult for Progressive to argue it acted "with the same haste

and precision" as if it were in Bell's shoes considering from April of 2016 to November of 2016, Venable and Progressive simply ignored the BI Claims against Bell making no attempt to contact W&Y regarding the status of Mathews' treatment.

### B.   *Wood v. Progressive Select Ins. Co.*

Recently, in *Wood v. Progressive Select Ins. Co.*, a Florida federal district court properly rejected Progressive's summary judgment motion under facts strikingly similar to the instant case. *See* Case No. 21-14172-CIV. 2022 WL 18023504 (S.D. Fla. Oct. 21, 2022).[3]   In *Wood*, Progressive's insured caused a MVA in October 2015 involving "minor damage" with no injuries reported at the scene. *See id.* at *1.   In November 2015, Progressive received notice from an attorney that a vehicle occupant ("claimant") was making an injury claim against Progressive's insured, who Progressive had already determined was solely at fault for the accident. *See id.*

Progressive requested that claimant's attorney provide medical records concerning another MVA that had occurred 15 years earlier. *See id.* at *2. The claimant's attorney did not provide such records to Progressive. *See id.* Instead, over a year later, claimant's attorney presented a "demand letter" offering to resolve the claim against Progressive's insured in exchange for Progressive's $50,000 policy limits. *See*

---

[3] Given its faithful adherence to controlling Florida law and its distinct factual similarities to the case at issue here, Bell urges the Court to treat *Wood* as exceedingly persuasive authority. Indeed, it appears that the *Wood* Court successfully endeavored to reach the same result that the Florida Supreme Court would have reached were it to have considered the matter.

*id*. Outlining claimant's injuries, the demand letter medical records indicated that the claimant: (1) suffered herniated discs; (2) was a "candidate" for an ACDF procedure; (3) was "considering" the ACDF procedure, but wanted to try more conservative treatment first; and (4) had medical expenses of approximately $15,000.00. *See id*. Progressive responded with an offer of only $4,350.00. *See id.*

A few months later, in January 2017, the claimant filed a lawsuit against Progressive's insured. *See id*. at *3. Progressive then called the claimant's attorney and determined that claimant had not yet undergone the ACDF procedure. *See id*. When claimant's attorney offered to resolve the matter for the policy limits based on the recommended surgery, Progressive again declined and offered to settle for $5,432.00. *See id*.

In October 2017, Progressive increased its reserve to policy limits and its "evaluation range" to $5,801 - $16,801. *See id*. Progressive's adjuster noted questions about causation and the recommended surgery. In March 2018, when claimant's attorney advised Progressive that he thought claimant had scheduled surgery, Progressive did not increase its offer. Three months later, claimant's attorney again offered to settle for policy limits after telling Progressive that claimant was scheduled for the recommended ACDF surgery. *See id.* Progressive did not settle. *See id*.

Ultimately, the claimant underwent the ACDF procedure in September 2018. Progressive learned of the surgery in early November 2018 and offered its policy limits

in December 2018. *See id*. at *4-*5. Claimant's attorney rejected the offer, the case proceeded to trial, an excess judgment was entered against Progressive's insured for over $250,000.00. *See id*. at *5. The insured then brought a bad faith case against Progressive for failing to settle the claim within the policy limits when it had a reasonable opportunity to do so. *See id*.

Arguing that no reasonable jury could find that Progressive acted in bad faith because it merely disagreed about the value of the claim, Progressive moved for entry of summary judgment. *See id*. Denying the motion, the *Wood* Court found that a reasonable jury could find bad faith on the part of Progressive "because not settling for policy limits at the time was in [Progressive's]—not [its insured's]—financial interests." *See id*. Emphasizing the importance of the jury's role in making such a determination, the *Wood* Court wrote:

> This is not to say that a reasonable jury may not . . . infer that [Progressive] acted in good faith during the Underlying Litigation. A reasonable jury may also infer that [Progressive's] settlement offers were reasonable and of the kind that "a reasonably prudent person, faced with the prospect of paying the total recovery, would" offer under the circumstances. *See Boston Old Colony*, 386 So. 2d at 785. Indeed, this kind of inference-making is appropriate only for a jury, not this Court; therefore, while the record before this Court at summary judgment *could* support [Progressive's] position, the determination whether [Progressive] acted in good faith is within the province of a jury.

*Id*.

Correctly applying Florida law, other federal district courts have likewise denied insurers' motions for summary judgment in bad faith cases under similar factual

circumstances. For instance, in *Davis n. Nationwide Ins. Co. of Am.*, the court noted that "[u]nder Florida's totality of the circumstances approach, the reasonableness and adequacy of an insurer's settlement offer are relevant factors to consider when determining bad faith, and as such, constitute genuine issues of material fact that preclude summary judgment." *See* 548 F. Supp. 3d 1295, 1300 (S.D. Fla. 2021) (quoting *Cousin v. Geico Gen. Ins. Co.*, 719 F. App'x 954, 961 (11ᵗʰ Cir. 2018)); *see also, Dudash v. S. Owners Ins. Co.*, 8:16-cv-290-T-27AEP, 2017 WL 1598974, at *4 (M.D. Fla. Apr. 28, 2017) (denying summary judgment based on insurer's failure to properly evaluate time limit demand which included medical records indicating "the possibility of future surgery"); *Gonzalez v. GEICO Gen. Ins. Co.,* 8:15-cv-240-T-30-TBM, 2016 WL 2759130 (M.D. Fla. May 12, 2016) (denying summary judgment where insurer declined claimant's offer to settle for $100,000.00 policy limits in advance of a recommended surgery).

### C.    Progressive's Bad Faith Mishandling of the BI Claim Against Bell

Like the insurers in *Wood*, *Davis*, *Dudash*, and *Gonzalez*, Progressive's claims handling surpassed a mere valuation error. Instead, a reasonable jury could find that no reasonably prudent person, faced with the prospect of paying the Mathews' total recovery, would offer $13,000.00 and fail to tender the policy limits under the circumstances presented here. Doing so, and then adhering to that plainly insulting number despite multiple solicitations for new offers amply supports bad faith

15

inferences. This is particularly so given that such adherence occurred while reserve limits were increased.

Further, a practice of ignoring surgical recommendations and quantifying only those that have certain temporal documentation cannot be in the insured's best interest. It definitely was not in Bell's best interest, where three separate surgeons had recommended surgeries to address Mathews' intractable pain, and Mathews unsurprisingly underwent such surgeries. Nor does it make sense in Florida where jurors in injury cases are instructed to award damages for future medical expenses which have not yet incurred, but are reasonably certain to be incurred. (*See* Doc. 34-30, p. 37:11-24.)

What's more, Venable included nothing in her valuation for the recommended surgeries because she purportedly had doubts that such procedures would occur—in part because injections were recommended instead. Venable's bad faith is obvious here because Venable allotted nothing in her valuation for the injections that she purportedly believed were replacing the surgery. Similarly, in attempting to excuse her discounting of Mathews' Shoulder Injury, Venable groundlessly cited "causation" issues—specifically, she referenced the "facts of the accident," "impact area," and that Mathews did not claim shoulder pain at the ER.[4]  (*See* Doc. 34-5, pp. 46:21–47:10.)

---

[4] Mathews did report pain in his right shoulder at the ER. *See* Doc. 34-14, p. 12 (PRG 04697)

Further, Mathews only received injections in his shoulder and lower back, not in his neck which was instead operated on (the ACDF).

Progressive and Venable's evaluation of Mathews' claim was born out of the monetary range inexplicably produced by the LNAV software program. Programs like LNAV operate with the express purpose of reducing or lowering claim evaluations by (1) reducing the amount of the past medical bills and (2) completely ignoring future medical expenses which are reasonably certain to be incurred, an element of recoverable damage under Florida law. By using this program, and not putting any consideration into reasonably certain future medical expenses, Progressive is betting that future medical expenses are not going to be a recoverable part of the claim. As a result, by definition, they operate to the benefit of the carrier. There is no reason to use such a program if you only have one claim. These programs are used to reduce the amount of a large number of claims. In other words, the overall goal of using the LNAV system is to save $1000 or so over 1000 different claims. The problem is, on the claims where Progressive bets wrong, the cost of losing is shifted to the insured in the form of an excess judgment.

This style of claim handling is the purest example of a carrier putting its own interests ahead of an insureds'. Bell receives no benefit from reducing the amount of Mathews' past medical bills or ignoring future medical expenses, yet he stands exposed to an excess judgment should Progressive's bet preclude the claim from being resolved.

**D.   The Motion**

In its Motion, Progressive relies extensively on *Deary v. Progressive Am. Ins. Co.,* 536 F. Supp. 3d 1258 (S.D. Fla. 2021), *aff'd*, 21-11878, 2022 WL 2916358 (11th Cir. Jul. 25, 2022), and *Feijoo v. Geico Gen. Ins. Co.*, 137 F. Supp. 3d 1320 (S.D. Fla. 2015), *aff'd*, 678 Fed. App'x 862 (11th Cir. 2017). Neither case is binding on this Court. *See McNamara v. Gov't Employees Ins. Co.*, 30 F.4th 1055, 1060 (11th Cir, 2022) ("While our unpublished opinions may be cited as persuasive authority, they are not considered binding precedent."). Nor is either case persuasive. *Feijoo* applied an incorrect standard of Florida bad faith law—specifically recited by the Eleventh Circuit in the unpublished opinion of *Novoa v. GEICO Indem. Co.*, 542 Fed. App'x 794 (11th Cir. 2013). *Novao* (and cases relying upon it) were expressly criticized as "erroneous" by the Florida Supreme Court in *Harvey*. *See* 259 So. 3d at 3, 4, 6–8, 10–12. Further, *Deary* is distinguishable.

The *Deary* Court pointed to the insurer's use of multipliers of medical and OOP to calculate settlement offers. Here, Progressive used fractions—not multipliers. Further, the *Deary* Court concerned a single surgical recommendation from one physician. At best, that *Deary* recommendation is somewhat comparable to Mathews' lumbar recommendation—where it may occur if his condition worsens. This case is different in that multiple surgeons recommended multiple surgeries in more certain language that was followed by verbal and written confirmation. *Deary* simply reflects

18

an extreme that should not be diluted lest the promise of a jury trial in bad faith litigation be undermined for Floridians.

### E.    Conclusion

In sum, there is sufficient evidence from which a jury may find Progressive breached its duty of good faith in its handling of Mathews' claim against Bell. As is the case in many bad faith claims, "while the record before this Court at summary judgment *could* support Defendant's position, the determination whether Defendant acted in good faith is within the province of the jury." *Wood*, 2022 WL 18023504, at *8; *see also Davis*, 548 F. Supp. 3d at 1300 ("[T]he reasonableness and adequacy of an insurer's settlement offer . . . constitute general issues of material fact that preclude summary judgment."). As the Eleventh Circuit has stated:

> In the end, [the plaintiff] might not prevail on his bad faith claim. There are . . . aspects of the record that support the conclusion that [the insurer] acted in good faith. But there are also aspects of the record that contradict that conclusion, and this is precisely the sort of situation in which Florida law makes clear that a jury trial is necessary.

*Moore v. GEICO Gen. Ins. Co.*, 633 Fed. App'x 924, 931–32 (11th Cir. 2016).


Dated: June 16, 2023            s/ Kenneth J. McKenna, Esq.
                                Dellecker, Wilson, King, McKenna, Ruffier & Sos,
                                LLP
                                719 Vassar Street
                                Orlando, Florida 32804
                                407-244-3000

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of June, 2023, a true and correct copy of the foregoing document has been electronically filed by using the Clerk of Court by using CM/ECF eFiling system which will automatically electronically furnish a copy to: Jordan M. Thompson, Esq, Megan E. Alexander, Esq., Carlos G. Gomez, Esq., Young, Bill, Boles, Palmer Duke & Thompson, P.A., 401 E. Jackson Street, Suite 1410, Tampa, FL  33602 (Jthompson@flalawyer.net, MAlexander@flalawyer.net, CGomez@flalawyer.net).

**DELLECKER WILSON KING
McKENNA RUFFIER & SOS
A Limited Liability Partnership**

BY:  s/ Kenneth J. McKenna
      Kenneth J. McKenna, Esq.
      Florida Bar No. 0021024
      Ryan K. Young, Esq.
      Florida Bar No. 112782
      719 Vassar Street
      Orlando, Florida   32804
      407-244-3000
      KJMeservice@dwklaw.com
      RKYeservice@dwklaw.com
      Attorneys for Plaintiff