UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DAYMON BELL,

    Plaintiff,

v.                                                    Case No: 8:22-cv-1054-KKM-TGW

PROGRESSIVE SELECT
INSURANCE COMPANY,

    Defendant.
_____

## ORDER

Daymon Bell sued Progressive, alleging Progressive violated its duty of good faith toward Bell as its insured. Progressive moves for summary judgment. Because genuine disputes of material fact exist (as they frequently do in bad faith insurance cases), Progressive's motion is denied.

### I. BACKGROUND[1]

On July 16, 2015, Bell and Howard Mathews were involved in a motor vehicle accident. Undisputed Facts (Doc. 34) ¶ 1. Although both cars were functional after the accident, the estimated property damage was $1,200. *Id.* ¶ 1. Mathews's car was towed,

---

[1] I recount the undisputed facts as contained in the record. To the extent facts are disputed or capable of multiple inferences, I construe the record in favor of the nonmovant. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1262 (11th Cir. 2020).

and EMS transported him to Lakewood Ranch Medical Center. *Id.* Bell's insurance policy at the time with Progressive covered up to $100,000 per person in bodily injury. *Id.* ¶ 2.

The next day, Mathews's insurance company, Hartford Insurance Company of the Midwest, notified Progressive of the accident and Mathews's soft tissue injuries to the neck and back. *Id.* ¶ 3. Miguel Sandoval was assigned the claim at Progressive and began investigating on the same day. *Id.* ¶ 4. Sandoval obtained Bell's statement on the facts of the accident, ordered the crash report, and contacted Mathews, who refused to give a statement but informed Sandoval that he had retained an attorney at Winters & Yonker, P.A. *Id.* On July 23, 2015, Progressive determined that Bell was covered for the loss. *Id.* ¶ 5. On July 24, 2015, the bodily-injury claim was assigned to Beverly Venable at Progressive. *Id.* ¶ 6. That same day, Venable updated Hartford by voicemail of the investigation and requested a call back to discuss the claim. *Id.* On July 28, 2015, Progressive received the crash report and a voicemail from Hartford stating that Hartford had taken a recorded statement of Mathews and determined that Bell was liable. *Id.* ¶ 7. Hartford also stated that Mathews had $10,000 in personal injury protection and $20,000 in per person uninsured motorist coverage. *Id.*

On July 30, 2015, Venable reviewed the claim, updated Bell on the claim status, and determined that Bell was fully liable. *Id.* ¶ 8. Venable called and left a message requesting a call back from Winters & Yonker, which she never received. *Id.* On the same day,

Venable received a letter from Marc Yonker advising that he represented Mathews and requesting insurance disclosures. *Id.* ¶ 9. On July 31, 2015, Venable sent the insurance documents to Yonker, copying Bell on the letter. *Id.* ¶ 10. Venable also sent a letter to Yonker advising of her handling of the claim, requesting that Mathews execute an enclosed medical authorization form, and requesting Mathews's medical bills, reports, and providers. *Id.* ¶ 11. Venable also sent a letter to Bell, informing him of Mathews's claim against him, his coverage, and an affidavit confirming that he was not acting within the course and scope of employment at the time of the accident and did not have other available insurance coverage. *Id.* ¶ 12. On November 5, 2015, Venable called Winters & Yonker and spoke to Heather Cangiano who said she would pass any request on to Philip Oles (Mathews's case manager at Winters & Yonker). *Id.* ¶ 13. Venable requested data compliance information and the status of Mathews's treatment from Cangiano, and made a to-do note to follow up on Mathews's treatment status. *Id.*

On January 11, 2016, Venable received a demand letter—dated January 8, 2016—from William Winters demanding the $100,000 policy limit and stating that Winters & Yonker would "recommend that our client accept" such amount if it was tendered. Ex. M (Doc. 34-13) at W&Y 0224; Undisputed Facts ¶ 14. The package also contained Mathews's medical records and bills, summarized as follows. Undisputed Facts ¶ 15.

3

Mathews arrived at the emergency room on a backboard with a C-collar with complaints of cervical pain, headaches, and mid-back pain with radiation to the shoulders from a low-speed accident. *Id.* ¶ 16(a). His age, sixty-seven, was considered a risk factor. *Id.* ¶ 16(a). Dr. Rawe's report indicated Mathews's pain was minimal, his physical examination was normal, and his CT scan of the cervical spine showed no evidence of trauma but did show degenerative changes. *Id.* Mathews was diagnosed with cervical sprain, prescribed anti-inflammatory medication and muscle relaxers, and discharged. *Id.*

On July 20, 2015, Mathews went to Physicians Group, LLC, for chiropractic treatment. *Id.* ¶ 16(b). He visited approximately eighteen times between July 20, 2015, and October 29, 2015. *Id.* On July 21, 2015, Mathews received x-rays of his spine and shoulder which revealed degenerative changes but no evidence of osseous or periosteal injury. *Id.* ¶ 16(c). On August 4, 2015, he received an MRI of his right shoulder, revealing "no evidence of a rotator cuff tear, some irregularity at the acromioclavicular joint, and glenoid labral irregularities." *Id.* ¶ 16(d). A cervical MRI on August 26, 2015, showed disc herniations at C3-4 and C5-6, disc bulging at C4-5 and C6-7, and prominent spondylosis at C3-4, which appeared to cause indentation on the hypopharynx causing airway obstruction. *Id.* ¶ 16(e). The cervical MRI also revealed spondylosis at C5-6, and C6-7. *Id.* A lumbar spine MRI on the same date revealed "moderate disc flattening, endplate

4

irregularity and bulging at L3-4, mild lower lumbar levoscoliosis, and slight crowding of the thecal sac at L2-3." *Id.*

On September 14, 2015, Dr. Frank Gomes evaluated Mathews and recommended conservative treatment, including lumbar home exercises, and referred him for cervical and lumbar injection therapy. Ex. N (Doc. 34-14) at PRG 04807-04808. Dr. Gomes opined that Mathews was currently a "candidate" for cervical discectomy and fusion. *Id.* at PRG 04807-04808, 04816. For the lumbar spine, he noted that while Mathews "symptoms do not appear to warrant surgical intervention" at the time, he "would likely require decompressive lumbar surgery" if his symptoms increase in the future. *Id.* at PRG 04808. Dr. Gomes concluded that Mathews had "a permanent cervical injury and a permanent aggravation of a pre-existing lumbar injury resulting in the need for surgical intervention," caused by the July 16 accident. *Id.* at PRG 04808.

On September 29, 2015, Dr. Gerald Nickerson evaluated Mathews and recommended transforaminal injections, epidural steroid injections, and trigger point needling. Undisputed Facts ¶ 16(g). On October 30, 2015, Mathews went to Winter Park Neurosurgery and was evaluated by Dr. John Jenkins. *Id.* ¶ 16(h). Mathews complained of a hoarse voice and trouble swallowing. *Id.* Dr. Jenkins noted Mathews's large osteophyte anteriorly at C3-4 could cause these issues. *Id.* Dr. Jenkin's physical examination of Mathews was normal, and Dr. Jenkins diagnosed Mathews with cervical spondylosis and

5

myelopathy. *Id.* Dr. Jenkins opined that Mathews was a "candidate [f]or surgery," namely anterior cervical discectomy and fusion with cadaver bone and plate. Ex. N at PRG 04913; Undisputed Facts ¶ 16(h). Jenkins ordered that Mathews undergo a swallowing evaluation before scheduling any surgery and noted that a "surgery w[ould] most likely be" scheduled when Mathews completed the evaluation. Ex. N at PRG 04913; Undisputed Facts ¶ 16(h). Also, on October 30, 2015, Dr. Jenkins told another physician that Mathews "will most likely require a four level discectomy and fusion." Ex. N at PRG 04771.

On November 20, 2015, Mathews went back to Physicians Group and was diagnosed by Dr. Chester Janecki with post-traumatic subacromial bursitis and tendinitis of the right shoulder, and post-traumatic acromioclavicular joint arthritis of the right shoulder—both related to the accident. Undisputed Facts ¶ 16(i). Dr. Janecki stated that Mathews "meets our indicators for arthroscopy of the shoulder with subacromial decompression," and that Mathews would consider shoulder surgery but was "not interested at this time." Ex. N at PRG 04768, 04770. On December 2, 2015, Mathews saw Dr. Joel Rose who opined that Mathews sustained a permanent injury to his cervical spine and a permanent aggravation of the lumbar spine. Undisputed Facts ¶ 16(j). Dr. Rose determined that Mathews's whole person impairment rating was 8%. *Id.* On December 10, 2015, Mathews saw Dr. Jenkins, who noted he had not done a swallowing evaluation, that one would be set up, and that Mathews would call once he completed the swallowing

6

evaluation. *Id.* Dr. Jenkins also noted that Mathews was a candidate for "epidural blocks versus surgery." Ex. N at PRG 04910.

On January 12, 2016, the day after receiving the demand letter, Robert Moore, Venable's superior, reviewed the letter, documented its due date, and delivered the letter to Venable. Undisputed Facts ¶ 17. On January 13, 2016, Venable created an evaluation template, and on January 19, 2016, sent Mathews's medical bills to Mitchell Decision Point (MDP), a software program to assist adjusters in organizing medical bills. *Id.* ¶ 17–18. On January 27, 2016, Venable reviewed the bills from MDP. *Id.* ¶ 19. Venable also conducted an evaluation of the claim, considering coverage, liability, vehicle damages, diagnosis, treatment, collateral source payments, bills, out-of-pocket expenses, and documents from the demand letter. *Id.* Venable summarized the medical records, noted that Mathews was a 67-year-old male with degenerative findings, and calculated his total medical expenses to be $21,943. *Id.* Reducing the amount by Mathews's $10,000 PIP coverage and health insurance with United Healthcare, Venable estimated the out-of-pocket costs to be $7,706 and requested up to $19,004 in authority for the claim. *Id.*

On January 28, 2016, Moore approved the evaluation and authority. *Id.* ¶ 20. Venable updated the claim to reflect her evaluation of Mathews's claim at $13,000. *Id.* On the same day, Venable called Winters & Yonker, extending the offer and discussing the case merits, and called Bell to inform him of the claim status. *Id.* Venable also sent Bell a

7

letter regarding the possibility of a lawsuit, and a letter to Winters & Yonker, copying Bell, via fax and mail confirming the offer and requesting that it be presented to Mathews. *Id.*

On February 4, 2016, Moore received a letter, dated January 28, 2016, from Winters stating that Mathews rejected the $13,000 offer. *Id.* ¶ 21. Winter's letter included an enclosed financial affidavit, and Winters requested that the affidavit be forwarded to anyone Progressive intended to include on any proposed release. *Id.* But the letter did not indicate that the affidavit was a condition of settlement. *Id.* On February 11, 2016, Venable reviewed the rejection letter and noted that Mathews did not make a counterdemand. *Id.* ¶ 22. Venable also left Bell a message advising him of the affidavit request, and Venable sent Bell a letter containing the affidavit and advised him that failure to complete the affidavit might hinder any settlement. *Id.* On February 19, 2016, Venable spoke with Bell, who confirmed he had received the financial affidavit but was unsure if he would complete it. *Id.* ¶ 23. Venable updated Bell on the claim. *Id.*

Later that day, Venable spoke with Oles (Mathews's case manager at Winters & Yonker), and advised him that she sent the affidavit to Bell. *Id.* ¶¶ 13, 24. Venable also requested a counteroffer from Mathews. *Id.* ¶ 24. Oles stated that there was no open settlement demand, and the opportunity to settle the claim for the policy limits had passed. *Id.* Oles claimed that the out-of-pocket expenses were $10,147, to which Venable indicated her disagreement and that even at Oles's number, the claim was not worth $100,000. *Id.*

8

Venable again asked for a counterdemand and, according to Venable's claim notes, Oles responded by saying that she was "to hear him clearly" and he would be putting it in writing that Progressive no longer had an opportunity to settle the claim because it did not offer the full limits. *Id.* Oles also stated that Mathews was "recommended" for shoulder and neck surgery. *Id.* Venable responded that the records showed he was a "candidate" for surgery and still needed a swallowing evaluation. *Id.* Oles responded that the surgery was "necessary" and would not be done on Progressive's time. *Id.* Venable requested pre-op documents proving that the surgery was scheduled. *Id.* The same day, Venable sent Winters & Yonker a letter confirming their rejection of the offer, advising that the affidavit had been forwarded to Bell, requesting confirmation that there was no longer an opportunity to settle, and requesting records of any additional treatment and pre-op records. *Id.* ¶ 25. Venable also increased the reserves to $25,000 and noted she would reevaluate the claim upon receipt of any additional records. *Id.*

On February 25, 2016, Venable received a letter, dated February 19, 2016, from Winters & Yonker that reiterated their rejection of the offer and stated that there was no open settlement demand. *Id.* ¶ 26. But the letter noted that Mathews "welcomed" any offers Progressive wished to make and enclosed a duplicate affidavit. *Id.* The letter did not include any additional records. *Id.* In late March 2016, Moore received another letter from Winters & Yonker, dated March 23, 2016, that enclosed another duplicate affidavit and a

9

copy of a release from Hartford, demonstrating that Hartford had tendered its UM policy limits. *Id.* ¶ 27. The letter also reiterated that there was no open settlement demand but that an offer from Progressive was "welcomed." *Id.* Venable reviewed the March letter on April 5, 2016, but stated in the case notes that Winters was "not willing to negotiate" because Winters did not make a counterdemand or seek anything less than the policy limits. *Id.* ¶ 28; Ex. B (Doc. 34-2) at PRG 017.

On the same day, Venable sent a letter to Winters & Yonker confirming receipt of the March letter and indicating that Progressive would consider any reasonably reduced demand. Undisputed Facts ¶ 29. Venable copied Bell on the letter, resent the financial affidavit to Bell, and called Bell. *Id.* Bell confirmed he would not complete the affidavit because it was asking for too much information. *Id.* Thereafter, Venable sent Bell a letter reiterating their call and confirming Bell elected not to complete the affidavit. *Id.* Venable advised Bell that his failure to complete the affidavit might prevent Progressive from being able to settle the claim. *Id.* On or about April 12, 2016, Venable received a letter from Winters confirming the receipt of her April 5, 2016 letter and soliciting an offer from Progressive without providing additional medical records. *Id.* ¶ 30.

On November 14, 2016, Moore (Venable's superior) updated the claim notes showing his receipt of an excess demand for $150,000 dated November 8, 2016. *Id.* ¶ 31. The excess demand documented Mathews's continued treatment after December 10, 2015,

10

including anterior cervical discectomy and fusion with instrumentation at C3-4 on August 16, 2016. *Id.* On November 15, 2016, the claim was transferred to Kris Mancini who requested authority to increase the reserves to $100,000 on the same day. *Id.* ¶ 32. Mancini sent Bell a letter advising him that he may be responsible for any excess damages, requesting any additional insurance he might have available, and advising him that Progressive would provide any attorney to represent him if a lawsuit was filed, but that he could hire personal counsel at any time. *Id.*

On November 23, 2016, Mancini recommended Progressive tender $100,000 based on the new records and left Bell a message requesting a call back to discuss the excess demand. *Id.* ¶ 33. Mancini sent Bell a copy of the excess demand, advising him of his coverage and possible responsibility for any excess verdict, and requesting that Bell contact Mancini if he wanted to discuss the case evaluation or give input regarding settlement. *Id.* Mancini's supervisor approved the $100,000, agreeing that it was in Bell's best interest to tender the limit because, although Mathews had degenerative osteophyte, Mathews could claim the accident aggravated it and resulted in surgery. *Id.* ¶ 34.

On November 28, 2016, Mancini spoke with Bell, who confirmed receipt of the excess demand and that he did not have anything to contribute to settlement. *Id.* ¶ 35. Mancini advised Bell of Winters's requested affidavit and Bell said he would complete it. *Id.* Mancini sent him another copy of the affidavit, advised Bell that she would hire an

11

attorney to represent him on the matter, and advised that she would be tendering the $100,000 limit. *Id.* On November 28, 2016, Mancini retained Stacy Yates, who then hand delivered a copy of the executed affidavit on December 1, 2016. *Id.* ¶ 36-37. Mancini sent a letter the same day to Winters via overnight FedEx and copied Bell acknowledging receipt of the demand and providing the executed affidavit. *Id.* ¶ 37. The letter also included a check for the $100,000 limits, a proposed release, a copy of Bell's lease renewal, and vehicle registration. *Id.* Mancini also stated that Bell "did not have pay stubs, bank statements, or tax returns to provide and confirmed that Bell was not in a position to financially contribute towards settlement." *Id.*

On December 13, 2016, Carol Brittain, Mancini's supervisor, received a letter dated December 7, 2016, from Winters rejecting the $100,000 offer, returning the voided check, and indicating that Progressive could re-issue the check for "partial payment" but it would not act as full and final payment. *Id.* ¶¶ 34, 38. On December 16, 2016, Mancini called Bell and sent him a letter, notifying him that a lawsuit may be filed. *Id.* ¶ 39. On December 29, 2016, Mathews filed a lawsuit against Bell and on May 10, 2021, after a jury trial, the court entered judgment against Bell for $629,000. *Id.* ¶¶ 40–41; Compl. (Doc. 1-1) ¶ 20.

On March 31, 2022, Bell sued Progressive for bad faith in its handling of the claim, and Progressive removed the case to federal court on May 5, 2022. *Id.*; Notice of Removal (Doc. 1). Progressive now moves for summary judgement, arguing that the undisputed

12

facts show that no reasonable jury could conclude that Progressive acted in bad faith. MSJ (Doc. 33).

## II. LEGAL STANDARD

Summary judgment is appropriate if no genuine dispute of material fact exists, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A fact is material if it might affect the outcome of the suit under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant always bears the initial burden of informing the district court of the basis for its motion and identifying those parts of the record that demonstrate an absence of a genuine issue of material fact. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). When that burden is met, the burden shifts to the nonmovant to present evidentiary materials (e.g., affidavits, depositions, exhibits, etc.) demonstrating that there is a genuine issue of material fact, which precludes summary judgment. *Id.* A moving party is entitled to summary judgment if the nonmoving party "fail[s] to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

I review the record evidence as identified by the parties and draw all legitimate inferences in the nonmoving party's favor. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1262 (11th Cir. 2020); *Dareing v. Bank of Am. Corp.*, 705 F. App'x 882, 885 (11th Cir. 2017)

13

(per curiam). Here, to the extent that the record is disputed or capable of multiple inferences, I draw them in favor of the non-movant.

III. ANALYSIS

Under Florida law, an insurer owes a "fiduciary duty requiring the exercise of good faith" towards its insured, including when an insured is embroiled in litigation that implicates the insurance policy. *Berges v. Infinity Ins. Co.,* 896 So. 2d 665, 677 (Fla. 2004) (quoting *Doe v. Allstate Ins. Co.,* 653 So.2d 371, 374 (Fla. 1995)); *Harvey v. GEICO Gen. Ins. Co.,* 259 So. 3d 1, 7 (Fla. 2018). Thus, an insurer owes a "duty of good faith" to the insured and "must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so." *Bos. Old Colony Ins. Co. v. Gutierrez,* 386 So. 2d 783, 785 (Fla. 1980). This good faith duty also requires the insurer to "advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid [the] same." *Id.* The critical inquiry is "whether the insurer diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment." *Harvey,* 259 So. 3d at 7. These requirements "are not a mere checklist. An insurer is not absolved of

14

liability simply because it advises its insured of settlement opportunities, the probable outcome of the litigation, and the possibility of an excess judgment." *Id.*

"[B]ad faith is ordinarily a question for the jury," and only in rare cases should a court decide the case as a matter of law during summary judgment. *Berges,* 896 So. 2d at 680; *Bos. Old Colony Ins. Co.,* 386 So. 2d at 785. Recent decisions of the Eleventh Circuit emphasize that courts must be reticent to grant summary judgment in Florida bad-faith insurance cases. *See Ilias v. USAA Gen. Indem. Co.,* 61 F.4th 1338, 1344–50 (11th Cir. 2023) (reversing the district court's order granting summary judgment for the insurer); *Aldana v. Progressive Am. Ins. Co.,* 828 F. App'x 663, 668–73 (11th Cir. 2020) (same).[2] Thus, whatever else might be said about the state of Florida bad-faith insurance law, this much is clear: Progressive bears a heavy burden at the summary judgment stage.

Applying Florida and Eleventh Circuit precedent here, material disputes of fact preclude summary judgment. Progressive determined the Bell was liable on July 30, 2015—two weeks after the accident. Undisputed Facts ¶ 8. Mathews sent his first demand letter on January 8, 2016, offering to settle his claim for the $100,000 policy limit. *Id.* ¶ 14. The

---

[2] *See also* Order Denying Renewed Mot. J. As a Matter of Law, *Brink v. Direct Gen. Ins. Co.,* No. 8:19-cv-2844-JSM-AEP (M.D. Fla. July 14, 2023) (Moody, J.), ECF No. 202, at 5 (noting that in *Aldana,* the Eleventh Circuit reversed the district court's order granting summary judgment in favor of the insurer, "despite undisputed evidence that: (1) the claimant's attorney never responded to the insurer's repeated requests to schedule a global settlement conference; (2) the insurer followed up no less than five times with its insureds to retrieve requested financial affidavits; (3) the insurer sent eight (largely unanswered) letters to the claimant's attorney offering to globally tender the insureds' policy limits; and (4) the claimants never offered to settle their claims within the insureds' limits nor expressed a desire to do so").

15

January 8 demand package included copies of Mathews's medical records. *Id.* ¶ 15. The medical records showed that between September 2015 and December 2015, three doctors opined that Mathews was a candidate for surgery. *Id.* ¶ 16(f)–(k). Also, Dr. Jenkins opined that Mathews would "most likely require" a surgery. Ex. N at PRG 04771. Although Jenkins ordered that Mathews undergo a swallowing evaluation before scheduling any surgery, Jenkins noted that a "surgery w[ould] most likely be" scheduled when Mathews completed the evaluation. Ex. N at PRG 04913; Undisputed Facts ¶ 16(h).

Beverly Venable, who Progressive assigned to handle Mathews's bodily-injury claim, reviewed the medical records and determined that Mathews incurred an estimated $7,706 in out-of-pocket medical expenses. Undisputed Facts ¶ 19. On January 28, 2016, Venable counteroffered that Progressive would settle Matthews's claim for $13,000. *Id.* ¶ 20. Mathews rejected the offer, *id.* ¶ 21, and Progressive made no other settlement offer until it attempted to settle Mathews's claim for the liability limit in December 2016. *See id.* ¶¶ 21–37.

On February 11, 2016, Venable called Philip Oles, the case manager for Mathews's claim at Winters & Yonker. Undisputed Facts ¶¶ 23–24. Oles told Venable that Mathews likely needed surgery. *Id.* ¶ 24. Oles also said that the opportunity to settle the bodily injury claim for the policy limit had passed. *Id.* But after the call between Venable and Oles, Mathews indicted twice—once in a letter dated February 19, 2016, and once in a letter

16

dated March 23, 2016—that he welcomed any settlement offers that Progressive's insured wished to make. *Id.* ¶¶ 26–27. Notwithstanding Mathews invitation for continued settlement offers from Progressive, Venable wrote in an April 5, 2016 claim note that Mathews's attorney was not willing to negotiate for a settlement. *Id.* ¶ 28.

Based on these facts, a reasonable jury could find that Progressive acted in bad faith by undervaluing Matthews's claim, failing to diligently avoid an excess judgment by initiating settlement discussions, and failing to settle where a reasonably prudent person would do so. *See Bos. Old Colony Ins. Co.*, 386 So. 2d at 785; *Harvey*, 259 So.3d at 7 ("In a case where liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations." (quotation omitted)). On the other hand, a reasonable jury could find that Progressive did not act in bad faith, given these circumstances. Thus, a jury must decide, not me.

Progressive relies on *Deary v. Progressive Am. Ins. Co.*, 536 F. Supp. 3d 1258 (S.D. Fla. 2021) (Middlebrooks, J.), *aff'd*, No. 21-11878, 2022 WL 2916358 (11th Cir. July 25, 2022) (per curiam), and argues that Mathews's surgery recommendations were too speculative and vague to justify a higher offer. MSJ at 6–9; *see also* Reply Supp. MSJ (Doc. 37) at 4–5. In *Deary,* the district court granted summary judgment in Progressive's favor when the doctor's "language regarding future surgical intervention was speculative, indefinite, and predicated upon the occurrence of multiple contingencies." *Deary,* 536 F.

17

Supp. 3d at 1268. Progressive notes that in this case, Mathews's surgery was contingent on passing a swallowing evaluation, that one doctor recommended epidural blocks instead of surgery, and that part of the record indicated that Mathews was not interested in the shoulder surgery at that time. MSJ at 16–17; Reply Supp. MSJ at 4–5. Those are all fair arguments to raise at trial, but they do not preclude a reasonable jury disagreeing with them.

Additionally, neither *Deary* nor the Eleventh Circuit's unpublished decision affirming *Deary* are controlling decisions, and *Deary* is distinguishable regardless. First, in *Deary*, the court noted that one doctor opined that the plaintiff might be a candidate for surgery, and that doctor's language "regarding future surgical intervention was speculative" and "indefinite." 536 F. Supp. 3d at 1268. Here, three doctors agreed that Mathews was a candidate for surgery and one doctor repeatedly opined that surgery was likely. Ex. N at PRG 04771, 04913; Undisputed Facts ¶ 16 (f), (h), (i). Like this case, the insurer in *Deary* counteroffered the plaintiff's demand without expressly accounting for future medical expenses and non-economic damages in its evaluation. *Compare Deary*, 536 F. Supp. 3d at 1267, *with* Undisputed Facts ¶¶ 19–20. In both this case and *Deary*, the insurers focused largely on the plaintiff's out-of-pocket medical expenses incurred before they sent the demand letter. *Compare Deary*, 536 F. Supp. 3d at 1267–68, *with* Undisputed Facts ¶¶ 19–20. However, the insurer in *Deary* offered to settle the plaintiff's claim for "nearly five times the documented cost of Plaintiff's medical expenses," which was "was reasonable

based on the record that it had before it at the time that it conducted the initial evaluation." *Deary*, 536 F. Supp. 3d at 1268. Here, Progressive's $13,000 counteroffer was roughly 1.7 times larger than Mathews's prior out-of-pocket expenses, even assuming that Mathews incurred only $7,706 in expenses (as Progressive calculated) and not $10,147 as Winters & Yonker claimed. Undisputed Facts ¶¶ 19, 24. And unlike *Deary*, one of Matthews's doctors repeatedly opined that surgery was likely. Ex. N at PRG 04771, 04913.

Progressive also argues that after the failed $13,000 counteroffer, it no longer had an opportunity to settle. Reply Supp. MSJ at 3. In Venable's conversation with Oles, Oles said that there was no open settlement demand, that the opportunity to settle for the policy limits had passed, and that Venable was to hear him "clearly" that there was no longer an opportunity to settle. Undisputed Facts ¶ 24. But a reasonable jury might conclude that these statements were undermined by later letters from Winters & Yonker soliciting further settlement offers from Progressive, *see id.* ¶¶ 26, 27, 30, and I must construe all disputed material facts in favor of Bell.

## IV.   CONCLUSION

Under governing precedent, a reasonable jury could find Progressive acted in bad faith. Accordingly, Progressive's Motion for Summary Judgement, (Doc. 33), is **DENIED**.

19

**ORDERED** in Tampa, Florida, on August 15, 2023.

*Kathryn Kimball Mizelle*
Kathryn Kimball Mizelle
United States District Judge

20